**School District No. 106, Cook County, Illinois, et al., Plaintiffs-Appellants, v. County Board of School Trustees of Cook County, Illinois, et al., Defendants-Appellees.**

**Gen. No. 49,045.**

First District, Fourth Division.

April 15, 1964.

Dale, Haffner & Grow, of Chicago (Mitchell J. Overgaard, of counsel), for appellants.

Rose, Burt & Pierce, of Chicago, for appellees.

MR. PRESIDING JUSTICE ENGLISH delivered the opinion of the court.

Plaintiffs are elementary and high school districts in Cook County from which land was detached by order of the County Board of School Trustees, upon petition by property owners in the area. By orders of both the Cook and DuPage county school boards, the land was annexed to the adjoining school districts predominantly in DuPage County. The defendants in this litigation are both county school boards and the petitioning property owners. From a decree of the Circuit Court affirming the orders, this appeal has been taken by plaintiffs.

██ █

██ In reviewing administrative proceedings, it is not the duty of this court to substitute its judgment for that of the boards but to determine whether the orders are supported by the evidence or, contrariwise, are against the manifest weight of the evidence. School Dist. No. 79 v. School Trustees of Lake County, 4 Ill2d 533, 541, 123 NE2d 475 (1955); Board of Education of Libertyville-Fremont School Dist. v. County Board of School Trustees, 33 Ill App2d 314, 179 NE2d 275 (1962).

Plaintiffs base their argument principally on the claim that personal preference of the parents was the only evidence introduced in favor of the boundary change. In view of the guidelines established by Article 7 of the School Code (Ill Rev Stats 1961, c 122, § 7-6),[1] this consideration would not be sufficient, according to plaintiffs, to warrant a detachment order. They further contend that the loss of revenue to the elementary school district occasioned by the detachment would be a serious detriment to the proper functioning of the school, in contravention of the statutory requirement that a transfer be in the "best

---

[1] The language of the statute is as follows: "Prior to the hearing the secretary shall submit to the county board of school trustees maps showing the districts involved, a written report of financial and educational conditions of districts involved and the probable effect of the proposed changes. The reports and maps submitted shall be made a part of the record of the proceedings of the county board of school trustees. The county board of school trustees shall hear evidence as to the school needs and conditions of the territory in the area within and adjacent thereto and as to the ability of the districts affected to meet the standards of recognition as prescribed by the Superintendent of Public Instruction, and shall take into consideration the division of funds and assets which will result from the change of boundaries and shall determine whether it is to the best interests of the schools of the area and the educational welfare of the pupils that such change in boundaries be granted, . . . ."

interests of the schools of the area and the educational welfare of the pupils."

An examination of the record discloses, however, that many considerations favored the change in boundaries. What plaintiffs have labelled "personal preference" was, we believe, the parental appreciation of these benefits, rather than an extra-statutory ground for board action.[2]

The event which gave rise to the petition was the construction of the Tri-State toll road close to the western edge of Cook County. The petitioning territory comprises that area cut off by the road from plaintiff school districts to the east. In order to get to school, children from the petitioning area had to use one of two roads (at the extreme north and south ends of the area in question) to cross by bridge (itself a hazard for children) over the toll road. These crossroads are four-lane, heavily-travelled highways which are not provided with pedestrian walkways and are posted for a speed of 40 miles per hour.

In addition to this safety hazard, the barrier of the toll road to the east served to accentuate the area's identity with the neighboring western districts which had been a center for social, commercial and religious activities. Participation in these affairs has been considered an important factor in a child's development in Burnidge v. County Board of School Trustees of Kane County, 25 Ill App2d 503, 509, 167 NE2d 21

[2] In arguing that personal preference was an improper consideration, appellants mistakenly rely on Trico Community v. County Board, 8 Ill App2d 494, 501, 131 NE2d 829 (1956); Lorenson v. County Board, 13 Ill App2d 468, 142 NE2d 493 (1957); and Board of Education v. County Board, 19 Ill App2d 196, 203, 153 NE2d 378 (1958). In Trico and Lorenson, preference was insufficient to warrant a detachment which would have been detrimental to the schools. The third decision found unworthy the political motivation of a petitioning parent.

(1960) [3] and Board of Education of Libertyville-Fremont School Dist. v. County Board of School Trustees, 33 Ill App2d 314, 179 NE2d 275 (1962), [4] and districting which encouraged that result was approved in both these cases.

Another factor favoring detachment was the proximity of the high school in the annexing district ½ to 2 miles as compared with 2.2 to 3.5 miles to the detaching high school campuses.

Perhaps the most persuasive evidence of the desirability of the transfer is the fact that currently the detaching high school district is paying tuition to send four children to the annexing high school. At the hearing, George Olsen, the superintendent of the detaching high school, testified that he had obtained such authorization to give "the children in this area at the highschool level the advantage of being in school where they are meeting after school the same

---

[3] In the Burnidge opinion the court said: "[A]n identification with a school district in a child's natural community center will inevitably result in increased participation in school activities by the child and his parents. Such increased participation cannot but result in an improvement in the educational picture of the entire area. By the same token, an unnatural identification with a school district would have an opposite result with a corresponding loss of participation and resulting poorer educational picture. In recognition of these facts the legislature made provision for proceedings to change the boundaries of existing districts."

Further considerations were that the school in the annexing area was closer, detachment would increase the value of the property, the educational advantages were equal, and there would be no detriment to the detaching district.

[4] A detachment order was affirmed in Libertyville-Fremont, where the preference of the parents was based on "the distance factor, the natural identification of the area with Lake Bluff and Lake Forest, the friendliness of the students residing in the area adjacent to Forest Knoll Estates to their children, and the fact that Lake Bluff is the community, social, and civic center of the territory as well as its shopping center."

162

kids." [5] As a result of this arrangement, transfer of the elementary students would effect a desirable continuity of associations from elementary to high school. Cf. Board of Education of Libertyville-Fremont School Dist. v. County Board of School Trustees, 33 Ill App 2d 314, 179 NE2d 275.[6]

---

The court found that these "personal preferences, while not controlling, are entitled to consideration, and where all other factors are equal, are very persuasive. (Citing Burnidge.)"

[5] In view of the testimony of its superintendent the position of the high school district as a plaintiff is explained by the desire to continue its "twenty years of cooperation" with one of its elementary school districts.

A further statement of this well-known educator's opinions is of interest. He testified:

"At the present time and due to our philosophy of being interested primarily in the kids, we felt that it was best in our twenty year period of attempting to get permanent boundaries for the Lyons Township High School and Junior College that because of the tollroad and the desires, I think almost 100% of the parents in this area west of the tollroad who have children in the elementary and in the high school, that it was probably best from the standpoint of the kids that they be permitted to attend the Hinsdale High School and the Elementary Schools.

. . . . . .

"I think it is rather unfortunate in terms of our state program of education that boards of education have to make decisions in terms of dollars instead of in terms of needs of boys and girls. I think our Board and I personally are in complete sympathy with the problems that School District 106 faces. We feel that it is unfortunate that the money involved has to influence what happens to the kids because certainly in terms of our extra curricular program, which is very broad, we feel very strongly that the boys and girls should be in the same school environment that they are in terms of the social environment, . . . ."

[6] The court stated: "The parents desire that their children attend the high school which is located in the same territory as is the grade school. The legislature of this state has expressed a similar desire, as is disclosed by the School Code (Ill Rev Stats 1959, c 122, § 4B-3). It is there provided that in the disposition of the territory of a dissolved school district the County Board of

163

In view of the foregoing considerations, we believe there was substantial evidence to support the board's order.

Plaintiffs argue additionally that the detachment order was against the manifest weight of the evidence and that the board did not properly "take into consideration the division of funds and assets" and each district's ability to meet standards of recognition, as required by section 7–6.

The principal evidence offered against detachment was an estimated annual loss of $10,000 in revenue to the detaching elementary school district.[7] The district claimed that this amount was disproportionate to the reductions in cost attending the departure of the petitioning children (nine in number). The district would also lose state aid and special education funds.

Since the depression of the thirties the district had experienced financial difficulties which required the issuance of tax anticipation warrants each year. It was not until the year prior to the filing of the instant petition that the picture brightened with an increase in tax rate from $1.40 to $1.60 for educational purposes,[8] which amounted to an overall rate of $2 includ-

---

School Trustees should, unless it is impossible, annex the territory of the district to a contiguous elementary district whose eighth grade graduates customarily attend the high school in that territory."

[7] Calculated on the basis of $543,889 assessed valuation for the petitioning area at an overall rate of $2.00 per $100.

The district's total cost for all funds was $492 per student.

[8] However, the president of the board of education testified: "We haven't asked for a referendum yet, we felt we were just reaching the level where we could break even and rather than throw more of a burden on our people, at least we hadn't considered it yet."

This testimony is commented on unfavorably by defendants as an admission that the district "has not shown evidence of any attempt, in thirty years, to relieve its burden, and even now has not sought or even considered an increased tax rate by referendum."

ing payment on building and educational bonds and interest. The district was currently operating in the black, but the treasurer testified that if detachment were allowed, the district would be "kicked back down into the pool again," and from this it is argued that there would necessarily be a return to deficit financing.

In our judgment the district's need for revenue from the detached area was not impressive. The gross loss of $10,000 was less than 2½% of its total budget of $420,000. So small a loss of revenue is not sufficient to stand in the way of an otherwise desirable change. Board of Education of Libertyville-Fremont School Dist. v. County Board of School Trustees, 33 Ill App2d 314, 179 NE2d 275 (1962); [9] Board of Education v. County Board of School Trustees, 45 Ill App2d 292, 294, 196 NE2d 3; Community Unit School Dist. No. 6 v. County Board, etc., 9 Ill App2d 116, 127, 132 NE2d 584; Community Consol. School Dist. No. 201 v. County Board of School Trustees, 7 Ill App2d 98, 102, 129 NE 2d 43. The relative insignificance of the financial loss in the case before us distinguishes the situation from that in Oakdale Community School Dist. No. 1 v. Trustees, 12 Ill2d 190, 145 NE2d 736 (1957) where detachment would have resulted in a loss of 20% of assessed valuation in one district and 10% in another. Such substantial losses, combined with resultant overcrowding in the annexing districts, were there held to

---

[9] The court in Libertyville-Fremont said: "The only reason disclosed by this record that might be adverse to the granting of the petition for detachment is that the Libertyville-Fremont District will lose some $3,486.00 in tax revenue each year. However, the loss of tax revenue where a territory is detached always occurs. One district loses and the other gains. The legislature fully understood this when it provided for changes in school boundaries. Loss of revenue standing by itself and especially where it will not materially affect the financial status of the losing district, as is the case here, is no reason for denying the right of detachment. (Stehl v. County Board of School Trustees, 7 Ill App2d 257, 266.)"

outweigh the advantage of contiguity to trading and banking facilities in the annexing area, and, in consequence, a detachment order was reversed. On the facts presented in the instant proceedings, however, we cannot say that the financial picture was misapprehended by the board.

In addition, we consider the board to have fulfilled the requirement that it hear evidence as to each district's ability to meet standards of recognition. The annexing districts represented through the secretary's report that the transfer would not "create hardship on their pupils nor reduce the quality of their educational program." [10] The detaching high school district was in no difficulty, according to its superintendent. Although the remaining elementary school district had been in financial straits and at the hearing its treasurer had alluded to loss of recognition as a matter of concern for all schools, it was never claimed that detachment would have that result.

We conclude that the slight possible damage to the educational offerings of the detaching district through the slight possible financial loss was not certain to occur, and in any event was not clearly more important than the advantage to the petitioning children in

---

[10] C. E. Spearman, the superintendent of the annexing elementary and high school districts, who also enjoys a fine reputation in the field of education, testified:

Our two Boards of Education have studied this matter and have concluded that this proposed change would serve the best interests of the children involved. Therefore our two Boards of Education have taken the position favoring the change, based on the hazards involved in getting to school and the fact that the youngsters have their community and social relationships on the west side of the toll road. We simply believe that the toll road represents a compelling natural boundary line both for the school district and for communities, and therefore we support the position of the Petitioners.

attending the annexing schools.[11] The board order was, therefore, not contrary to the manifest weight of the evidence. In so concluding, we bear in mind the sage comment of the Supreme Court in School Directors of School Dist. No. 82 v. Wolever, 26 Ill2d 264, 267, 186 NE2d 281 (1962):

> The judiciary is ill equipped to act as a super school board in assaying the complex factors involved in determining the best interest of the schools and the pupils affected by a change in boundaries.

■ ■ Plaintiffs further attack the sufficiency of the compliance with the statutory requirement that a map and a written report be submitted to the board. The map is claimed to be defective in displaying only the losing districts and thus would not aid in the determination of whether the annexing districts were contiguous and could absorb the territory into a compact form as required by section 7-4. Ill Rev Stats, c 122, § 7-4.

It appears, however, that the map portrayed enough of the annexing districts to show that they adjoined the petitioning territory. Moreover, it was a fully detailed guide of the detaching district, showing streets, toll road, and schools as well as streams, parks and golf courses. When the map was amplified by the testimony of various witnesses that the territory was contiguous to the annexing districts, and further

---

[11] We believe that any one year's net loss from detachment would not be a sound basis for determination in view of the fluctuating nature of school enrollment and the possible, if not probable increase in tax rate and/or property assessment valuation. Moreover, there was currently a potential increase in attendance from the area due to the substantial number of children—fourteen out of twenty-nine—attending parochial schools.

amplified by the board's own specific knowledge of the territory under its supervision (derived from prior proceedings), we conclude that the board had all of the information necessary for a proper determination from a geographical standpoint.

The sufficiency of the written report is also questioned. Section 7–6 directs that such a report show the "financial and educational conditions of districts involved and the probable effect of the proposed changes." The report in this case is not as complete as might ordinarily be expected.[12] What saves its otherwise scanty nature, however, is the context that gave rise to this proceeding. The board had issued prior detachment orders in the general area west of the toll road and had made a prior investigation of the particular area when only a portion of the owners now petitioning had applied for detachment.[13] The

---

[12] The report in full is:

"The above petition, filed on June 18, 1962 by a purported legal number of signers, seeks to detach all of the *remaining territory west of the Toll Road* and annex the same to Hinsdale elementary and high school districts #181 and #86. *This is the step suggested by the Cook County Board of School Trustees some time ago, but it was not possible to take it until conditions were ripe for the move. It appears that now is the time to consider taking such a step.*

"The assessed valuation of the area involved is $543,889.00. There are approximately 9 children of elementary school age and 6 children of high school age living in the area.

"I have been told informally that the Hinsdale Public Schools have no objection to this petition and that it will not create hardship on their pupils nor reduce the quality of their educational program.

"It is therefore my suggestion that the Board consider this petition favorably and grant its prayer." (Emphasis supplied.)

[13] The opening statement of the secretary at the hearing included: "Gentlemen, some time ago, this County Board of School Trustees had a number of individual petitions detaching piecemeal territory west of the tollroad in Western Springs, District, I think, 101 and 106 was involved as I recall, and the Board suggested to the petitioners that because the tollroad was quite a barrier and was quite—

board had very evidently determined to wait until all of the area west of the toll road could be detached. With this background, we cannot say that the board was hampered by the meagerness of the report nor that the report failed to meet the minimum requirements of the statute, especially in view of the scope of the evidence at the hearing.

The only case discussing deficiencies in the map and written report is Crainville School Dist. No. 37 v. County Board, 32 Ill App2d 143, 146, 177 NE2d 248 (1961)

> The secretary's purported map consisted merely of a drawing of a rectangle and his report of financial conditions merely showed assessed valuations, amounts levied and expended for educational purposes, and the amount of state aid claims. The statement does not include any information as to tax rates nor indebtedness, and there was no information as to the amount levied or expended for building purposes.

Besides these failures, the court found that there was "no testimony to supplement the scanty information in the report." The petitioners had failed to elaborate their reasons for requesting detachment and made no

and was creating some problems that they all get together and present a petition to take care of all the territory west of the toll-road."

In the board's order granting detachment is the following finding: "That construction of the Illinois Tri-State Toll Highway has for practical purposes restricted intermingling between the area involved and the bulk of the area comprising the Cook County School Districts; that by reason thereof several small portions of the area have, since construction of the highway, been permitted by this Board to be disconnected from Cook County School Districts and annexed to DuPage County School Districts as being in the best interests of the pupils and Districts involved; that granting of the instant petition will render the heretofore irregular boundaries regular."

complaint of school conditions in the detaching district.

In the present case, the report, map and all the evidence, plus the prior investigation of the area by the board, demonstrate a substantial compliance with the statutory mandate.

■ Plaintiffs also claim that much of the matter presented to the board should not have been considered because it was not in the form of testimony by witnesses, but, rather, it was included in a statement made by an attorney for the petitioners. We think it appropriate for an administrative board to consider a presentation by an attorney in a case such as this, and note that the points he touched upon were essentially cumulative of the testimony and related to matters not in dispute. Ill Rev Stats c 122, § 7-6.

In our opinion there was sufficient evidence to support the board order; the decision was not against its manifest weight; and there was substantial compliance with statutory requirements. Accordingly, the judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER and McCORMICK, JJ., concur.